## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## —BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
ENTERED

SEP 0 2 2005

Michael N. Milby, Clerk of Court
By Deputy Clerk _____

PRAPTAL S. BAGGA,
  Plaintiff,

§
§
§

vs.

§
§

CIV. NO. B-04-167

FL RECEIVABLES TRUST 2002-A,
et al.,
  Defendants.

§
§
§
§

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion to Remand [Docket No. 41], multiple

motions to dismiss filed by each of the fourteen defendants [Docket Nos. 5, 6, 7, 8, 9, 11, 12, 17,

18, 19, 20, 21, 44, 45], and a motion to transfer venue [Docket No. 49].

## I.  INTRODUCTION

Plaintiff originally filed his petition in the 107th Judicial District Court in Cameron

County, Texas, alleging malicious prosecution, false arrest and imprisonment, intentional

infliction of emotional distress, and defamation in relation to a January 2004 indictment charging

Plaintiff with violating Texas Penal Code § 32.33 (Hindering Secured Creditors).[1]  Defendants

removed the above-styled cause of action to this Court claiming that diversity jurisdiction over

the dispute existed because the resident defendants were improperly joined.[2]  Since removal, and

prior to the plaintiff filing a motion to remand, all of the defendants filed Rule 12(b)(6) motions

---

[1]  The indictment was dismissed on May 6, 2004.

[2]  The resident defendants are Javier Gonzalez, James Hunter, and Royston, Rayzor,
Vickery & Williams, L.L.P. ("Royston Rayzor").  Both Gonzalez and Hunter are attorneys with Royston
Rayzor.  All three defendants are hereinafter collectively referred to as either the "Royston Rayzor
defendants" or the "resident defendants."

to dismiss for failure to state a claim upon which relief can be granted.  [Docket Nos. 5, 6, 7, 8, 9, 11, 12, 17, 18, 19, 20, 21, 44, 45]

Although each defendant has filed a separate Rule 12(b)(6) motion, the arguments raised are very similar.  All of the defendants argue that: (1) the privilege protecting communications made in relation to pending or proposed judicial proceedings precludes any causes of action against them and (2) Plaintiff cannot prove all of the elements of his malicious prosecution claim because he cannot prove that the defendants lacked probable cause.  Moreover, if the malicious prosecution claim fails, they all fail because they are so closely intertwined.[3]  A third argument is raised by the five defendants that are attorneys and the three defendant law firms for whom they work.[4]  They claim that the attorney immunity doctrine precludes any causes of action against them because any alleged tortious conduct was taken in furtherance of the representation of their clients.[5]

In addition to their Rule 12(b)(6) motions, some of the nonresident defendants have filed Rule (12)(b)(2) motions.[6]  They argue that Plaintiff has not established that they have had

---

[3]      The five elements of a malicious prosecution claim are: (1) the commencement of a criminal prosecution; (2) with malice; (3) without probable cause; (4) resulting in an acquittal; and (5) damages.  *Digby v. Texas Bank*, 943 S.W.2d 914, 918–19 (Tex. App.—El Paso 1997, writ denied).

[4]      The five attorney defendants are Robert Hermann [Docket No. 9] and Jean Burke [Docket No. 5] of Thacher, Proffitt & Wood, L.L.P. ("Thacher Proffitt") [Docket No. 8], Lawrence Tabas [Docket No. 7] of Obermayer, Rebmann, Mawell & Hippel, L.L.P. ("Obermayer Rebmann") [Docket No. 6], and Gonzalez [Docket No. 19] and Hunter  [Docket No. 18] of Royston Rayzor [Docket No. 17].

[5]      Although some Texas cases refer to the attorney immunity doctrine as "attorney privilege," this Court will refer to the defense asserted by the attorney defendants as attorney immunity.

[6]      St. Germaine & Richards, Inc. ("St. Germaine") [Docket No. 44] is a New Jersey corporation.  Edward Schwartz [Docket No. 45] and William Horan [Docket Nos. 10, 11] are New Jersey residents.  Thacher Proffitt [Docket No. 8] is a Delaware limited liability partnership with its principal

-2-

sufficient contacts with Texas that would justify this Court's exercise of specific jurisdiction over them. The remaining nonresident defendants—i.e., FL Receivables Trust 2002-A ("FL Receivables"), Prudential Equity Group, L.L.C. ("Prudential"), and Wilmington Trust Company ("Wilmington Trust")—have conceded jurisdiction.

Normally, a district court is required to rule on whether it has subject matter jurisdiction before it can review whether it has *in personam* jurisdiction over each defendant. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). Indeed, Plaintiff urges this Court to rule on the motion to remand without proceeding to the motions to dismiss for lack of personal jurisdiction. All of the Rule 12(b)(2) motions, however, are "straightforward" under the standard set out by the United States Supreme Court in *Ruhrgas AG v. Marathon Oil Co., et al.*, 526 U.S. 574, 588 (1999). Unlike the issues raised in the Rule 12(b)(2) motions, the determination of whether subject matter jurisdiction exists raises complex questions of Texas law. Therefore, for the reasons stated below, the Rule 12(b)(2) motions filed by Defendants Horan [Docket Nos. 10, 11], Thacher Proffitt [Docket No. 8], Hermann [Docket No. 9], Burke [Docket No. 5], Schwartz [Docket No. 45], and St. Germaine [Docket No. 44] are hereby **GRANTED**. The Rule 12(b)(2) motions filed by Defendants Tabas [Docket No. 7] and Oberymayer Rebmann [Docket No. 6] are hereby **DENIED**.

With regard to Plaintiff's Motion to Remand [Docket No. 41], the sole question before the Court is whether the Royston Rayzor defendants were properly joined. For the purposes of

---

office in New York. Hermann [Docket No. 9] and Burke [Docket No. 5] are New York residents. Obermayer Rebmann [Docket No. 6] is a Pennsylvania limited liability partnership. Tabas [Docket No. 7] is a Pennsylvania resident. These defendants are hereinafter collectively referred to as the "nonresident defendants."

an improper joinder claim,[7] if there is any possibility whatsoever that any one of the claims

lodged against the Royston Rayzor defendants is valid, then joinder is proper and the case must

be remanded.  Due to the fact that in some limited instances Texas law allows for causes of

action against attorneys, even those whose conduct is related to their representation of a client,

and because this Court must resolve all disputed questions of fact and any uncertainties in

controlling law in favor of Plaintiff, the Court hereby rules that the Royston Rayzor defendants

are not improperly joined.  Consequently, this Court does not have subject matter jurisdiction

and, therefore, Plaintiff's Motion to Remand is hereby **GRANTED**.

Since this Court lacks jurisdiction, all other pending motions, including FL Receivables'

Motion to Transfer Venue [Docket No. 49] and the remaining Rule 12(b)(6) motions [Docket

Nos. 12, 17, 18, 19, 20, 21] are hereby **DENIED as moot**.

## II.     FACTUAL BACKGROUND

This case is one in a series of disputes between the parties.  Although a slew of

proceedings have been instituted in Pennsylvania involving collection actions, criminal charges,

and RICO claims against Plaintiff or entities controlled by Plaintiff,[8] this lawsuit centers around

---

[7]     In *Smallwood v. Illinois Central Railroad Co.*, 385 F.3d 568 (5th Cir. 2004), the Fifth Circuit departed from the use of the term "fraudulent joinder," noting that there is no substantive difference between that term and "improper joinder". *Id.* at 571 n.1. Therefore, this court will henceforth use the term "improper joinder."

[8]     The Bagga entities mentioned herein and other entities controlled and/or owned by Bagga are defendants in two cases in the United States District Court for the Eastern District of Pennsylvania: 2:02cv2080 and 2:03cv5108.  The first case involves the collection action originally filed by Captec.  It was stayed on January 7, 2005, as a result of the Chapter 7 bankruptcy filings of Jamuna, Bagga Enterprises, and United Management, all of which are wholly owned and controlled by Bagga. The second case involves claims brought by FL Receivables against entities controlled and/or owned by Bagga alleging RICO violations, conversion, and fraudulent transfer.  Although the RICO claims have since been dismissed, the conversion and fraudulent transfer claims are still pending.  It should also be noted that at least two other criminal actions were instituted against Bagga in Pennsylvania.  *See* Pl's

-4-

the January 2004 Cameron County, Texas, indictment.  The facts are hotly contested and the record, while extensive, is somewhat ambiguous, having critical gaps in places concerning the events underlying the actual dispute before the Court.[9]  The salient facts as this Court has been able to discern are as follows:

Plaintiff, a Pennsylvania resident, developed and operated several Arby's franchise restaurants in Texas and Pennsylvania between May 1987 and November 2001.  In 2000, Plaintiff commenced four Arby's projects located in the Rio Grande Valley including an Arby's restaurant in Brownsville ("Brownsville Arby's") and another location in Mission ("Mission Arby's").[10]  The real estate for both the Brownsville and Mission Arby's restaurants was purchased by a holding entity, Jamuna Real Estate, L.L.C. ("Jamuna"), which is wholly owned and controlled by Plaintiff.  The actual franchises were owned and operated by an operating entity, Bagga Enterprises, Inc. ("Bagga Enterprises"), also wholly owned and controlled by Plaintiff.  Captec Financial Group, Inc. ("Captec"), a commercial lender from whom Plaintiff borrowed funds to establish other Arby's locations, loaned the Bagga entities over $2 million to develop the Brownsville and Mission locations.[11]  The Bagga entities pledged both the real

_____

Orig. Pet., Docket No. 1.

[9]     These gaps once filled may ultimately benefit the parties who remain in this lawsuit; however, this Court can only rule on what it currently has before it.

[10]     The Brownsville Arby's was opened to the public on September 7, 2000, and closed less than a year later in August 2001.  The date the Mission location opened is unclear; however, it closed in June 2001.  *See* Pl's Orig. Pet., at 8.

[11]     The record is somewhat unclear as to how many loans were issued by Captec to entities controlled and/or owned by Bagga.  Some of the loan documents relating to the Brownsville location show that loans were also made in relation to two other Rio Grande Valley Arby's projects in Weslaco and Edinburg, Texas.  *See See* Pl's Orig. Pet., Ex. 1, vol. 1.  Whether Plaintiff actually commenced the development of Arby's restaurants in Weslaco and Edinburg is unknown.  Moreover, Plaintiff's Original

-5-

property and restaurant equipment related to the Brownsville and Mission Arby's locations as security for the loans.[12] As part of the loan agreement, Captec required that all of the Bagga real estate and operating entities to which Captec had previously lent money guarantee the new loans.[13]

Around May 2001, Jamuna and Bagga Enterprises defaulted on their payments to Captec in relation to the Brownsville and Mission Arby's locations, as well as to other Arby's projects in Pennsylvania. Captec initiated legal proceedings against Bagga Enterprises, Jamuna, United Management Services, Inc., and Welcome Group, Inc., in May 2002 in the United States District Court for the Eastern District of Pennsylvania.[14] Although judgments were not entered against the Bagga entities in Pennsylvania until December 20, 2002, Bagga has pled that representatives of Captec met with him several times to discuss how to dispose of the assets securing the loans so as to maximize Captec's recovery. In fact, Captec entered into two forbearance agreements with the Bagga entities after the Pennsylvania collection actions had commenced. *See* Pl's Orig. Pet., at 9.

Despite the fact that the security agreement required Bagga to obtain permission from

---

Petition refers to Harlingen and McAllen locations that are not reflected in the loan documents. Whether Plaintiff intended to refer to the Weslaco and Edinburg locations referenced in the loan documents or whether there are locations in Harlingen and McAllen in addition to those in Weslaco and Edinburg is also unknown.

[12] The loan documents contain a Michigan choice-of-law provision and venue provisions in which the parties agree to litigate in either Michigan, Pennsylvania, or Texas. *See id.* at Exs. 1–3, vol. 1.

[13] It should be noted that Bagga maintains that none of the loans in question were made to him personally, that all of them were non-recourse as to him personally, and that none of them required his personal guaranty. *See* Pl's Orig. Pet., at 8 n.3.

[14] United Management Services, Inc., and Welcome Group, Inc., are entities also wholly owned and controlled by Bagga. *See supra* n.9.

-6-

Captec before moving equipment, in a letter dated May 22, 2002, Bagga informed Captec that he had moved some of the equipment located in the Brownsville and Mission Arby's locations to other Arby's restaurants in Texas and Pennsylvania or into storage. *Id.* at Ex. 5, vol. 1. According to the declaration of Raymond Biggs, an employee of Captec who was in charge of handling the Bagga loans (discussed below), the letter is a written memorialization of a conversation between Bagga and Biggs in which Bagga first provided notice of the equipment removal.[15] *Id.* at Ex. 1, vol. 2, ex. 10. Attached to the letter was a list describing the location of each piece of equipment with the exception of the "small wares."[16] The same list was re-sent to Captec as well as to Captec's counsel on June 24, 2002. *Id.* at Exs. 6, 7, vol. 1.

In September 2002, prior to the final judgments being entered in the Pennsylvania collection actions, Captec assigned all of its rights, title, and interest in the loans to the Bagga entities relating to the Brownsville and Mission Arby's restaurants to Prudential.[17] The assignment was part of a settlement of Captec's obligations to Prudential, one of Captec's

---

[15] The Biggs Declaration stops short of stating that Captec gave Bagga permission to move the equipment. Indeed, Biggs stated in a deposition that Bagga did not have permission prior to removing the equipment. [Pl's Orig. Pet., Ex. 1, vol. 2] This Court, however, notes that Biggs also never stated that Bagga was asked to return the equipment. Indeed, the dates on the forbearance agreements entered into by Captec and Bagga, being subsequent to the removal, imply that Captec did not object to the equipment removal once notice was provided.

[16] "Small wares" include cooking utensils, condiment containers, napkin holders, and the like. *See id.* (Biggs Declaration).

[17] The details of the assignment agreement have not been supplied to this Court. Apparently, as part of the agreement, Prudential was also assigned two other loans relating to Arby's restaurants owned by Bagga entities. Those entities were located in Wilkes-Barre and Scranton, Pennsylvania. Although Bagga developed other Arby's projects in the Rio Grande Valley, the only Texas loans that were assigned to Prudential were those relating to the Brownsville and Mission locations.

-7-

warehouse lenders.[18]  Prudential thereafter reassigned the loans to FL Receivables, one of its

trusts.  The trustee of FL Receivables is co-defendant Wilmington Trust.[19]  As a result of this

assignment, FL Receivables was substituted as the plaintiff in the Pennsylvania collection actions

in February 2003.

In March 2003, Bagga met with representatives from Prudential and FL Receivables in

New York in order to continue the negotiations originally started with Captec regarding recovery

on the loans.  Defendant Schwartz was present at that meeting as a representative of Prudential.

He had been hired by Prudential as a consultant and assigned the responsibility of servicing and

handling the collection activities relating to the loans to the Bagga entities.  Defendants Hermann

and Burke, lawyers with the Thacher Proffitt law firm, were also present at the meeting

representing Prudential and FL Receivables.  Although the actual events that transpired are a

matter of debate, it appears that at least part of the negotiations involved the location of the

equipment in the Brownsville and Mission Arby's restaurants, which were no longer operating.

Plaintiff's position was that he had informed Captec on at least four occasions of where the

equipment was located, and that Captec informed Prudential.  The defendants that attended the

meeting, on the other hand, believed that they were never informed of the new locations for the

equipment in question and that consent was never given for the equipment to be removed.

---

[18]     Although Plaintiff names Prudential Securities, Inc. a/k/a Wachovia Securities, Inc. a/k/a
Wachovia Prudential Financial Advisors, L.L.C., in his Original Petition, Prudential's pleadings state that
Plaintiff should have identified Prudential Equity Group, L.L.C. as the proper defendant.  In fact, that is
the entity that answered this lawsuit.  Therefore, this Court will assume that Prudential Equity Group is
the proper entity for the purposes of these motions.

[19]     It should be noted that the interests of FL Receivables, Wilmington Trust, and Prudential
are closely aligned and they assert the same arguments in their motions to dismiss; therefore, this Court
often refers to them interchangeably.

Moreover, they contend that Plaintiff never gave them a straight answer as to where the equipment was located at that time. Bagga asserts that his relationship with Prudential's representatives deteriorated after the New York meeting.

The fragility of Bagga's relationship with representatives of Prudential is evidenced by the fact that on April 30, 2003, Schwartz executed an affidavit in New York stating that Bagga acknowledged he had removed the equipment from the Brownsville Arby's without FL Receivables' prior knowledge or consent.[20] The affidavit asserts that a demand was made for the return of the equipment—a demand which had not been complied with at the time the affidavit was executed. Moreover, it states that Schwartz believed that Bagga violated Texas Penal Code § 32.33 by removing, concealing, or otherwise harming or reducing the value of the collateral located in the Brownsville and Mission Arby's restaurants. Bagga denies the assertions made in Schwartz's affidavit.[21]

Soon thereafter, around June 2003, FL Receivables directed its local counsel in Brownsville, Texas, Royston Rayzor, to conduct an onsite inspection of the closed Brownsville Arby's and to inventory the equipment on the premises. Two Royston Rayzor attorneys—Hunter and Gonzalez—conducted an inspection on June 3, 2003.[22] Hunter later wrote a report that listed

---

[20]    Plaintiff did not attach a copy of the Schwartz affidavit to his Original Petition. A copy, however, has been attached to all of the defendants' motions to dismiss.

[21]    One should note that while Bagga makes numerous assertions throughout his various pleadings disputing the claims made by the defendants, he did not provide an affidavit in support of those assertions nor (with the exception of the Biggs testimony and certain documentation) evidence of any kind in support of those claims.

[22]    The record is unclear as to whether Gonzalez was also present at the seizure. In fact, the only claim pled by Bagga against Gonzalez individually is that he was present at the inspection of the Brownville Arby's, and that that inspection led to the composition of the Hunter report. Although this Court would be inclined to grant Gonzalez's Rule 12(b)(6) motion based on that sole allegation, the

the equipment missing from the Brownsville location and corresponding valuations of that equipment. *See* Pl's Orig. Pet., Ex. 1, vol. 3. Hunter also had an opportunity to view the premises on June 11, 2003, when the United States Marshal executed a civil seizure of the Brownsville Arby's. Defendants have stated that this report was in compliance with the United States Marshals Service's rules for seizure of property. [Docket No. 59] In that report, Hunter estimated that the original cost of the missing equipment was $150,000, $98,000 of which was outdoor signage comprised of the pylon Arby's sign and sign pole. He also estimated that the current value of the missing equipment at the time the report was written was between $75,000 and $100,000.

Plaintiff contends, and Defendants do not dispute, that both the Hunter report and the Schwartz affidavit were eventually submitted by the defendants to an Assistant District Attorney ("ADA") for Cameron County, Texas, which led to the institution of criminal charges against Bagga.[23] Bagga was indicted on January 14, 2004, and charged with violating Texas Penal Code § 32.33. Although a resident of Pennsylvania, Bagga traveled to Texas to voluntarily surrender himself to Cameron County authorities. He was released on bond shortly thereafter.

On March 3, 2004, Plaintiff submitted the Biggs declaration to the Cameron County ADA handling the matter. Biggs, the former employee of Captec who had worked on the collection

---

Court lacks subject matter jurisdiction and, therefore, cannot rule on Gonzalez's motion.

[23]    Defendants have acknowledged that the Schwartz affidavit was submitted to a Cameron County ADA [Docket No. 49]; however, the date and the manner in which the affidavit was submitted is unknown. Although Defendants have never specifically admitted that the Hunter report was also submitted to the ADA, they have not disputed Plaintiff's assertion. In fact, during a hearing held on January 5, 2005, defense counsel tacitly admitted that that was the case. She summarized Plaintiff's counsel's argument by stating that "what we have is a claim that the inventory list that was submitted to the DA's office was inaccurate or incomplete."

efforts relating to the Bagga loans, declared that Bagga had notified Captec that he had removed equipment from the Brownsville and Mission Arby's restaurants and that he never attempted to conceal the whereabouts of that equipment. Moreover, the declaration states that after Prudential acquired the Bagga loans from Captec, it received the loan file, which contained information regarding the removal of the equipment.[24]

Although the charges in Cameron County were eventually dropped, Bagga alleges that in a "desperate attempt" to keep the ADA from dropping the charges, Defendants attempted to provide "new" evidence personally delivered by Defendant Tabas of the Obermayer Rebmann law firm to the Cameron County authorities. The evidence consisted of a series of e-mails between Biggs and Joel Stowers, a consultant hired by Captec to assist in the collection efforts relating to the Bagga loans. An affidavit was also provided to the ADA executed by one of Captec's employees, which raised questions about the veracity of the Biggs declaration.[25] Nonetheless, the charges were dropped on May 6, 2004, and a subsequent indictment has never issued. This lawsuit was filed by Plaintiff on September 22, 2004.

---

[24] As stated above, it should be noted that the declaration does not state that Bagga had Captec's express permission to move the equipment and the Biggs deposition unequivocally states that Bagga did not have permission prior to moving the equipment. However, Biggs also testified that he did not think Bagga was attempting to conceal the whereabouts of the equipment or that he intended to hinder any secured creditors.

[25] The affidavit of Steven Willison states that Captec did not retain a copy of the contract files when it transferred its interest in the loans to Prudential; however, it retained e-mails relating to the Bagga loans. According to Willison, based upon the e-mails, there was no indication that a request was made to Captec to move equipment. Willison also stated that he had no knowledge of whether any written notation was made of such a request in the contract file. He concluded that it was his belief that Captec never consented to the movement of equipment out of the Brownsville Arby's location. Bagga claims that the Willison affidavit is wrought with misleading statements.

-11-

### III.   PERSONAL JURISDICTION

The following defendants have filed Rule 12(b)(2) motions to dismiss: Horan [Docket Nos. 10, 11], Hermann [Docket No. 9], Burke [Docket No. 5], Thacher Proffitt [Docket No. 8], Tabas [Docket No. 7], Obermayer Rebmann [Docket No. 6], Schwartz [Docket No. 45], and St. Germaine [Docket No. 44].[26] The remaining defendants have conceded jurisdiction.

Citing *Ruhrgas*, the nonresident defendants urge the Court to rule on the Rule 12(b)(2) motions before proceeding to the motion to remand.[27] The United States Supreme Court in *Ruhrgas* held that the general rule directing federal courts to determine whether subject matter jurisdiction exists before proceeding to issues of personal jurisdiction is not hard and fast. *Ruhrgas*, 526 U.S. at 587. Instead, where "a district court has before it a straightforward personal jurisdiction issue presenting no complex question of state law, and the alleged defect in subject-matter jurisdiction raises a difficult and novel question, the court does not abuse its discretion by turning directly to personal jurisdiction." *Id.* The defendants point out that the Rule 12(b)(2) motions are straightforward while the motion to remand is complicated by the determination of whether attorney immunity applies. They also point out that if the Court rules in favor of Plaintiff on the motion to remand, the nonresident defendants will be forced to present entirely new verified pleadings in state court thereby depriving them of an efficient resolution of their motions. [Docket No. 46] This Court agrees with the nonresident defendants that the

---

[26]    Each defendant has supported their specific motion by at least an affidavit. While Plaintiff has not countered such affidavits with contrary evidence of any kind, he has indicated his opposition to each of the motions.

[27]    It should be noted that the Supreme Court in *Ruhrgas* overturned a Fifth Circuit ruling. *Marathon Oil Co. v. Ruhrgas AG*, 115 F.3d 315 (5th Cir. 1997), *vacated*, 129 F.3d 746 (5th Cir. 1997), *reh'g en banc*, 145 F.3d 211 (5th Cir. 1998).

-12-

personal jurisdiction issues are straightforward and, therefore, will address the Rule 12(b)(2)

motions before turning to Plaintiff's Motion to Remand.

### A.    Applicable Personal Jurisdiction Law

A federal district court may exercise personal jurisdiction over a nonresident defendant if:

(1) the long-arm statute of the forum state permits the exercise of personal jurisdiction over the

nonresident defendant and (2) the exercise of such jurisdiction is consistent with due process

under the Constitution of the United States. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002).

When, as here, a district court does not conduct an evidentiary hearing, the plaintiff bears the

burden of pleading personal jurisdiction over a nonresident defendant, but need only present

prima facie evidence. *Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1, 4 (5th Cir. 2004) (not

designated for publication); *Revell*, 317 F.3d at 469.  "Any genuine, material conflicts between

the facts as established by the respective parties' appropriate affidavits, and other proper

summary judgment type evidence, must be resolved in Plaintiff's favor." *Jones v. Petty-Ray*

*Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992).  "The court need not,

however, accept 'merely conclusory' allegations as true." *Cent. Freight Lines, Inc. v. APA*

*Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).  Due to the fact that Texas' long-arm statute

reaches to the constitutional limits, *Revell*, 317 F.3d at 469–70, the Court now turns to the

question of whether exercising personal jurisdiction over the nonresident defendants would

offend due process.

In order to satisfy due process, the exercise of personal jurisdiction must meet two

requirements.  First, the nonresident defendants "must have purposefully availed [themselves] of

the benefits and protections of the forum state by establishing 'minimum contacts' with that

forum state." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Second, the exercise of personal jurisdiction over the nonresident defendant cannot offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Sufficient minimum contacts will give rise to either specific or general jurisdiction. Specific jurisdiction exists if the cause of action is related to or arises out of the nonresident defendant's contacts with the forum state. *Revell*, 317 F.3d at 470. General jurisdiction may be found when the claim is unrelated to the nonresident's contacts with the forum but where those contacts are "continuous and systematic." *Id.*

Once minimum contacts have been established within the forum state, courts turn to whether it is fair or reasonable to require the nonresident to defend the suit there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–77 (1985). Courts take into consideration the following factors in determining whether the assertion of personal jurisdiction is fair: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining efficient resolution of controversies; and (5) states' shared interest in furthering fundamental social policies. *Id.* at 477.

### B.   Jurisdictional Facts as They Relate to Each Defendant

Plaintiff argues that this Court has specific jurisdiction over the nonresident defendants because all of the acts involving the procurement of the Cameron County indictment "were directed towards or designed to affect or take advantage of the Texas criminal justice system,

-14-

persons or property in Texas."[28]  [Docket No. 53, at 49]  Bagga bases his specific jurisdiction

claim on the tort prong of the Texas long-arm statute, which allows for jurisdiction over one who

commits a tort in whole or in part in Texas.  TEX. CIV. PRAC. & REM. CODE ANN. § 17.042.  In

essence, Plaintiff contends that all of the defendants were involved in a conspiracy to manipulate

the Texas criminal justice system in retaliation against Plaintiff and that these acts somehow

confer specific jurisdiction on this Court.[29]  However, under the two-prong personal jurisdiction

test, Plaintiff must establish that each defendant has established minimum contacts with Texas.

*See Delta Brands*, 99 Fed.Appx. at 6 (stating that the plaintiff was required to demonstrate that

the defendant individually and not as part of a conspiracy had minimum contacts with Texas).

Therefore, the Court now turns to the pleadings in order to determine whether Bagga has

established a prima facie case against each individual defendant that would allow this Court to

assert personal jurisdiction over them.  The following facts are undisputed in that only the

defendants have provided this Court with any evidence.

### 1.    William Horan [Docket No. 10, 11]

Horan, a New Jersey resident, is a retired employee of Prudential.  He never traveled to

Texas in relation to the matters at issue and has had no other dealings in Texas.  Plaintiff alleges

---

[28]    No argument has been advanced that any of the defendants urging Rule 12(b)(2) motions are properly sued in Texas under the concept of general jurisdiction.

[29]    Although Plaintiff did not specifically plead it as a separate cause of action, his original petition alleges that the defendants conspired to commit malicious prosecution, false arrest and imprisonment, intentional infliction of emotional distress, and defamation.  Therefore, Plaintiff has arguably also pled a cause of action for civil conspiracy.  The tort of civil conspiracy requires the proof of five elements: (1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective; (4) one or more unlawful, overt acts in furtherance of the objective; and (5) damages as a proximate result.  *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 90 (Tex. App.—San Antonio 2003, pet. denied)[hereinafter *SACU*].

-15-

that Horan was Schwartz's supervisor at Prudential in New York. Plaintiff's sole jurisdictional argument regarding Horan is that he is vicariously liable for the actions taken by Prudential and FL Receivables, who have conceded jurisdiction. Even if Horan was vicariously liable, that does not automatically confer to this Court *in personam* jurisdiction over him. "Succinctly paraphrased, 'jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation.'" *Stuart v. Spademan*, 772 F.2d 1185, 1197 n.11 (5th Cir. 1985) (quoting *Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798, 803–04 (S.D.N.Y. 1975)). Plaintiff has failed to provide prima facie evidence in support of his jurisdictional claims over Horan. Therefore, Horan's Rule 12(b)(2) Motion to Dismiss is granted.

### 2.    Hermann, Burke, and Thacher Proffitt [Docket Nos. 5, 8, 9]

Hermann and Burke are employees of the Thacher Proffitt law firm. Thacher Proffitt is a Delaware limited liability partnership whose principal office is in New York City. Other offices are located in Washington, D.C., New Jersey, and Mexico City. Its partners are residents of New York, New Jersey, Connecticut, Virginia, Maryland, Pennsylvania, the District of Columbia, and Mexico. It does not maintain an office in Texas nor does it own property or pay taxes in Texas. Both Hermann and Burke are residents of New York and neither traveled to Texas in connection with the matters at issue.

Plaintiff alleges that in an effort to refute the Biggs Declaration, Hermann and Burke noticed the deposition of Raymond Biggs that took place in Michigan in relation to one of the Pennsylvania actions. While Bagga argued at this Court's hearing on January 5, 2005, that the Thacher Proffitt lawyers were the planners and controllers of every alleged bad act, he did not suggest that any of those acts or omissions (planning sessions or other transgressions) ever

-16-

happened within the borders of this great state. As stated above, Michigan is the closest Bagga ever gets Hermann, Burke, or Thacher Proffitt to Texas. He has not pled a prima facie case for jurisdiction over these defendants and he has certainly not controverted the proof provided in support of their motions to dismiss. Therefore, the Rule 12(b)(2) motions to dismiss filed by Defendants Hermann, Burke, and Thacher Proffitt are also granted.

### 3.    Tabas and Obermayer Rebmann [Docket Nos. 6, 7]

The Obermayer Rebmann law firm is a limited liability partnership organized under the laws of Pennsylvania. All of its partners, including Tabas, are residents of Pennsylvania. No offices or employees reside in Texas. None of its lawyers are licensed in Texas. It has no contracts nor does it do business in Texas. Tabas never traveled to Texas prior to the indictment. He has never been employed in Texas.

Bagga alleges that Tabas traveled to Texas three months after the indictment was issued to deliver new evidence to the ADA in an effort to keep the Cameron County officials from dismissing the charges against Bagga. Tabas has not denied these allegations.[30] As discussed above, Plaintiff has alleged that the acts of the defendants led to defamation, malicious prosecution, intentional infliction of emotional distress, and false imprisonment and that Tabas, acting as a partner of Obermayer Rebmann, traveled to Texas specifically to further the alleged conspiracy against Bagga.

Tabas argues that his sole Texas act was to provide information (documents) to the

---

[30]     The declaration of Tabas does not openly admit that he traveled to Texas in order to provide any information to Cameron County authorities. Rather, it states: "Prior to Mr. Bagga's indictment, I had never traveled to Texas in relation to the matters at issue in this lawsuit." [Docket No. 7, Ex. 5]

-17-

Cameron County ADA who was handling the prosecution after Bagga was indicted.  He contends

that: (1) these acts are privileged by law and, therefore, he is immune from suit and (2) his post-

indictment conduct has no relevance on any issue.  These arguments may very well be

meritorious, but they are in the nature of a Rule 12(b)(6) motion or, perhaps, a later motion for

summary judgment.  They are not controlling as to whether Tabas or his firm can be hailed into

court in Texas.

Without commenting on the merits of either Bagga's claims or the defenses discussed

above, this Court holds that Tabas and, as a consequence, Obermayer Rebmann have

purposefully availed themselves of the benefits of Texas and, therefore, have sufficient minimum

contacts to support a claim of specific jurisdiction.  Further, the exercise of jurisdiction does not

offend traditional notions of fair play and substantial justice.  Tabas came to Cameron County

and met with Cameron County officials allegedly on behalf of his (and his law firm's) clients.[31]

It can hardly be characterized as unjust for either of them to appear in Cameron County, Texas, to

answer for the alleged consequences of such actions.  Tabas and Obermayer Rebmann's Rule

12(b)(2) motions are denied.[32]

### 4.    Schwartz and St. Germaine [Docket Nos. 44, 45]

Schwartz, a resident of New Jersey, is the sole shareholder of St. Germaine, which is a

---

[31]    It should be noted that Plaintiff has also argued that the attorney defendants cannot claim attorney immunity because they are not admitted to Texas pro hac vice.  He cites no authority for this point and this Court is unimpressed with that argument.

[32]    The denial of this jurisdictional motion should not be construed as a comment on the merits of the claims against Tabas whose only actions seem to be two to three months after the indictment issued.  If so, it would be a stretch to find his actions causally connected to any of Bagga's claims.  Having found it does not have subject matter jurisdiction, however, this Court feels that it cannot now address Tabas and Obermayer Rebmann's Rule 12(b)(6) motions.

New Jersey corporation. He was hired as a consultant by Prudential and assigned the task of recovering the amounts on the loans to the Bagga entities transferred from Captec to Prudential. He has not traveled to Texas in relation to the matters at issue nor has any employee of St. Germaine. Neither Schwartz nor St. Germaine do business or are registered to do business in Texas. In fact, their contacts with Texas are minuscule at best.

Plaintiff argues, without any proof, that jurisdiction is proper over Schwartz because he executed a false affidavit and caused it to be provided to the Cameron County District Attorney's office.[33] Furthermore, he argues without providing any support that Schwartz directed the Royston Rayzor defendants to provide the allegedly false Hunter report to the district attorney's office in Cameron County, Texas, and that he actively promoted the charge against Plaintiff. The plaintiff's position is somewhat similar to the appellants' arguments in *Memorial Hospital System v. Fisher Ins. Agency*, 835 S.W.2d 645 (Tex. App.—Houston [14th Dist.] 1992, pet. denied).

In that case, the Fourteenth Court of Appeals held that a single phone call from outside the state into Texas could serve as the basis for sufficient minimum contacts. *Id.* at 651–52. The hospital (as the plaintiff) was relying on a single phone call between one of its employees in Texas to an employee of Fisher located elsewhere. During that call, Memorial was assured that a patient presenting himself for treatment had compensation coverage—a statement which later turned out to be untrue. The court held that one who sends a false statement into the state knowing that it would be relied upon by a resident of that forum state must anticipate being haled

---

[33]     It is not disputed that the Schwartz affidavit, even though executed in New York, was eventually "published" by FL Receivables in Texas. *See Docket No. 49*, at 8–9.

into court to answer for such a statement. *Id.* at 650. Bagga would have this Court adopt similar reasoning and hold that Schwartz could reasonably foresee being haled into court in Texas by executing an arguably false affidavit and publishing it in Texas, especially since the affidavit references Texas law.

However, the jurisdictional proposition advanced in *Memorial Hospital* has recently been overruled by the Supreme Court of Texas in *Michiana Easy Livin' Country, Inc. v. Holten*, No. 04-0016, 2005 WL 1252268 (Tex. May 27, 2005). In *Holten*, the question was whether a Texas resident could sue a nonresident in Texas based on misrepresentations made by the nonresident in a phone call. The court specifically disapproved of cases that would have specific jurisdiction turn on whether a defendant's contacts were tortious rather than the contacts themselves. *Id.* at *8. It noted that if courts focus on whether a defendant's conduct was tortious in determining jurisdiction, the possibility arises that a jury would later find in favor of the defendant, thereby calling into question whether the court had jurisdiction to hear the case in the first place. *Id.* The Supreme Court of Texas also noted that if courts look to whether a defendant directed a tort at Texas, the focus will be shifted from the relationship of the defendant to the forum and litigation to the relationship of the plaintiff to the forum and litigation. *Id.* at *7. Such a situation would lead to a jurisdictional rule that guilty nonresidents can be sued in Texas, while innocent ones cannot. *Id.* at *8. The Supreme Court of Texas found that proposition to be an unacceptable interpretation of the Texas long-arm statute. This Court likewise rejects that theory.

Ultimately, there is no proof of whether Schwartz knowingly made a statement (false or otherwise) in Texas or even directed a statement at a Texas resident. Bagga makes a logical leap that the reference in the Schwartz affidavit to a Texas statute means that Schwartz intended to

and did in fact publish the affidavit in Texas. This Court cannot take such a leap of faith, however logical it may seem to some, where it is not supported by anything more than mere speculation. From the record, it is clear that the affidavit in question was executed in New York and that Schwartz did not personally deliver it to Texas. Plaintiff has not alleged that Schwartz presented it to the Cameron County District Attorney's office nor that he came to Texas to participate in any of the activities of which Bagga now complains.[34] St. Germaine, his company, is not alleged to have committed any acts separate and apart from those committed by Schwartz. Instead, he argues that, at a minimum, Schwartz and St. Germaine are vicariously liable for the actions taken by FL Receivables and Prudential, who have conceded minimum contacts with Texas and do not challenge this Court's *in personam* jurisdiction. Regardless of whether Schwartz's actions were tortious, neither he nor St. Germaine have sufficient contacts with Texas to support a claim of specific jurisdiction. Nor does the fact that FL Receivables has conceded jurisdiction confer jurisdiction over Schwartz or St. Germaine. Therefore, the Rule 12(b)(2) motions to dismiss filed by Schwartz and St. Germaine are also granted.

## IV. MOTION TO REMAND

Defendants Tabas, Obermayer Rebmann, FL Receivables, Wilmington Trust, Prudential, Royston Rayzor, Hunter, and Gonzalez remain in this case. Therefore, in order to determine whether subject matter jurisdiction exists, the Court must next determine whether the Royston Rayzor defendants were improperly joined. For the purposes of an improper joinder claim, if

---

[34] Bagga's allegations and speculations as to what happened and who the various actors were may very well turn out to be true, but the Court cannot rule on Rule 12(b) motions based on conclusory hunches and guesswork even if they are educated ones. This is especially true when the least bit of discovery could have confirmed those suspicions.

-21-

there is any possibility whatsoever that any one of the claims lodged against the Royston Rayzor defendants is valid, then joinder is proper and the case must be remanded. *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003).

### A.    Improper Joinder Criteria

The removing party bears the burden of proving that the non-diverse defendant has been fraudulently joined to defeat diversity, either by showing that (1) there has been outright fraud in the plaintiff's recitation of jurisdictional facts or (2) there is no possibility that the plaintiff would be able to establish a cause of action against the non-diverse defendant. *Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995). The instant matter involves the second prong under which courts examine "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood*, 385 F.3d 568, 573 (5th Cir. 2004).

A court has two ways of determining whether a plaintiff has a reasonable basis of recovery under state law. *Id.* The first option involves conducting a Rule 12(b)(6)-type analysis, "looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant." *Id.* The court "must evaluate all of the factual allegations in the light most favorable to the plaintiff, resolving all contested issues of substantive fact in favor of the plaintiff." *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815–16 (5th Cir. 1993). Such a procedure is similar to that used for ruling on a motion for summary judgment. *Id.* at 816. If a party can survive that type of analysis, there is no improper joinder. *Id.*; *Smallwood*, 385 F.3d at 573. The second option should only be used in cases where a

-22-

plaintiff has stated a claim but has misstated or omitted discrete facts that would determine the propriety of joinder. *Id.*; *see also McDonal v. Abbott Labs.*, 408 F.3d 177, 183 n.6 (5th Cir. 2005). In such cases, courts have the discretion to "pierce the pleadings and conduct a summary inquiry." *Id.* While the defendants have vehemently argued that Plaintiff's version of events is incorrect, they have not alleged that Plaintiff has misstated or omitted discrete facts, or committed any type of fraud in the pleadings. Therefore, this Court must conduct a Rule 12(b)(6)-type analysis in order to determine whether Texas law would recognize a cause of action against the Royston Rayzor defendants.

### B.    Possibility of Recovery Against the Resident Attorney Defendants

Defendants claim that diversity jurisdiction exists because Plaintiff cannot maintain a cause of action against the Royston Rayzor defendants who are protected by (1) the attorney immunity doctrine and (2) the immunity protecting communications made in contemplation of or during judicial proceedings. "Each action Bagga complains of was taken by the attorney defendants in furtherance of their representation of [FL Receivables] during the Enforcement Actions, Collection Actions, and/or the RICO Action." [Docket No. 46, at 4–5].

To determine whether the Royston Rayzor defendants were improperly joined, the Court must ascertain whether Bagga has pled any viable causes of action against them. "As a federal court sitting in a diversity case, this Court must apply the law as would a Texas court, by applying existing Texas law or by predicting how the Texas Supreme Court would decide the legal issue." *Lewis v. Am. Exploration Co.*, 4 F. Supp. 2d 673, 676 (S.D. Tex. 1998). If there is no definitive decision on point from the Supreme Court of Texas, this Court must look to decisions of Texas' intermediate appellate courts. *Id.* "Such decisions are controlling on

-23-

questions of state law unless there is a strong indication that the Texas Supreme Court would

reach a different result." *Id.; see also Taco Bell Corp. v. Cracken*, 939 F. Supp. 528, 531 (N.D.

Tex. 1996).

### 1.    The Attorney Immunity Doctrine

Defendants cite Texas and federal case law in support of the proposition that the attorney

immunity doctrine is applicable in the instant matter.  Indeed, they go so far as to state that the

immunity is absolute and that attorneys cannot be held liable for any conduct taken in the course

of representing their clients.  They primarily rely on a line of cases holding that if an attorney's

conduct was part of the discharge of his or her duties in representing a party in a lawsuit, then he

or she cannot be held liable to a third party for such conduct.

That line of cases is exemplified by *Bradt v. West*, 892 S.W.2d 56 (Tex. App.—Houston

[1st Dist.] 1994, writ denied).  In *Bradt*, the First Court of Appeals held that an attorney does not

have a cause of action against another attorney for conduct engaged in as part of a suit in which

the attorneys represented opposing parties. *Id.* at 71–72.  "An attorney should not go into court

knowing that he may be sued by the other side's attorney for something he does in the course of

representing his client; such a policy would favor *tentative* representation, not the *zealous*

representation that our profession rightly regards as an ideal and that the public has a right to

expect." *Id.* at 72 (emphasis in original).  The *Bradt* court focused its inquiry on "the kind of

conduct engaged in, not on whether the conduct was meritorious in the context of the underlying

lawsuit." *Id.*

Although *Bradt* involved an attorney suing opposing counsel, other courts have applied

the reasoning in *Bradt* to cases brought by individuals against opposing counsel for conduct that

-24-

occurred within the context of a lawsuit. For example, in *Renfroe v. Jones & Associates*, 947 S.W.2d 285 (Tex. App.—Fort Worth 1997, writ denied), the Second Court of Appeals ruled that summary judgment in favor of the attorney defendants was proper because the cause of action arose from conduct that was privileged. The underlying lawsuit involved a wrongful garnishment action brought by the plaintiff against her judgment creditors and their attorneys. The appellate court held that the conduct of the attorney defendants, which involved preparing and filing their clients' application for a writ of garnishment on Renfroe's bank accounts, was within the context of discharging their duties in representing their clients. "An attorney may assert any of his client's rights without being personally liable for damages to the opposing party." *Id.* at 287. The appellate court echoed *Bradt* by stating that if "an attorney's conduct was part of discharging his duties in representing his client," such conduct "is not actionable even if it is meritless." *Id.* at 288.

The San Antonio Court of Appeals followed *Bradt* and *Renfroe* in *White v. Bayless*, 32 S.W.3d 271 (Tex. App.—San Antonio 2000, pet. denied), emphasizing that preparing and filing various pleadings constitutes conduct within an attorney's duties in representing a client. *Id.* at 276. The San Antonio appellate court stated:

> A disgruntled litigant has no right of recovery against the opposing attorney for that attorney's having made certain motions in the underlying lawsuit, regardless of whether the motions were meritless or even frivolous, because making motions is conduct an attorney engages in as part of the discharge of his duties in representing a party in a lawsuit. Even when an attorney engages in wrongful conduct as part of the discharge of his duties in representing a party in a lawsuit, there is no cause of action to the party on the other side.

*Id.*

Federal courts have also adopted the reasoning embodied in *Bradt* in cases involving

-25-

attorney defendants.  For example, in *Taco Bell Corp. v. Cracken*, 939 F. Supp. 528 (N.D. Tex.

1996), the federal district court asserted that *Bradt* applied with equal force to cases involving an

attorney's liability to an opposing party because "[t]he knowledge of an attorney for one party

that he may be sued by the other party would exacerbate the risk of tentative representation to at

least the same degree as would knowledge that opposing counsel could sue him." *Id.* at 532.

*Taco Bell* involved allegations that the attorney defendants engaged in "collusive" conduct that

enabled their clients in a state court wrongful death suit to maintain venue in a favorable forum.

The plaintiff sued the attorney defendants claiming fraud, abuse of process, conspiracy, and

negligent misrepresentation.  Focusing on the kind, rather than the nature, of the underlying

conduct, the court dismissed all of the plaintiff's claims because the attorney defendants could

not be held liable "for acts or omissions undertaken as part of the discharge of their duties as

attorneys to opposing parties in the same lawsuit." *Id.* 532–33.

 Another example of a federal court following *Bradt* is *Lewis v. Am. Exploration Co.*, 4 F.

Supp. 2d 673 (S.D. Tex. 1998).  In *Lewis*, all of the claims rested on whether the attorney

defendants engaged in improper discovery when their client denied the existence of certain

documents and facts that were later produced in a different lawsuit brought by another person

injured in the same accident.  The plaintiffs sued the attorney defendants for fraud and conspiracy

to defraud alleging that the attorney defendants and their client's failure to produce discoverable

documents and information resulted in the improper dismissal of the underlying state court case.

*Id.* at 674.  In granting a motion for summary judgment in favor of the attorney defendants, the

court noted:

  [T]he only acts and omissions alleged are acts undertaken by lawyers representing

a client in responding to discovery requests from an opposing party. The type of
conduct in which the attorneys allegedly engaged is without dispute part of
discharging their duties in representing their client. Such conduct does not make
the attorneys liable in tort damages to the opposing party. Labeling such conduct
as fraudulent or as part of a conspiracy to defraud does not subject the attorneys to
liability for tort damages to the opposing party under Texas law.

*Id.* at 680.

The Fifth Circuit has also written on the attorney immunity doctrine under Texas law,

albeit in an unpublished opinion. In *Guthrie v. Buckley*, 79 F. App'x 637 (5th Cir. 2003) (not

designated for publication), the Fifth Circuit upheld a district court's dismissal of a malicious

prosecution claim brought against an attorney and her client for conduct taken in a previous suit

seeking enforcement of a child custody order. The attorney in the underlying suit included

nineteen criminal contempt-of-court counts demanding incarceration in her motion to enforce the

child custody order. Citing *Bradt*, the circuit court held that the attorney defendant's pleadings

were acts within the discharge of her duties as an attorney and, therefore, the plaintiff had no

cause of action under Texas law. *Id.* at 638–39. "An attorney or an opposing party may seek

sanctions for the opposition's allegedly meritless or malicious acts, 'but the law does not provide

a cause of action.'"[35] *Id.* at 638.

Although the aforementioned cases reflect a very strong public policy in favor of

providing lawyers with significant leeway in the actions they may take in representing their

clients, such cases are not absolutely controlling. The specific allegations lodged by Bagga

against the resident attorney defendants involve a conspiracy to bring about criminal charges

---

[35]     The Fifth Circuit also noted that the non-attorney defendant, i.e., the client, could not be
held liable because he did nothing more than "hire an attorney to zealously represent him in enforcing a
child custody order." *Id.* at 639.

against him and a written report containing false information that was provided to Cameron County authorities.  Such conduct may be distinguishable from the cases discussed above, which, unlike the case at hand, involve conduct that falls squarely within what is considered an integral part of discharging the duties of an attorney.  In *Bradt* and *Guthrie*, the plaintiffs sued opposing counsel for making motions to hold the plaintiffs in contempt of court.  In *White*, the plaintiff accused the attorney defendants of seeking and obtaining "extra-legal" orders from the judge that were harmful to him financially.  In *Taco Bell*, the plaintiff sued the attorney defendants for conspiring to maintain a favorable venue by adding the plaintiff as a defendant in the underlying lawsuit once venue could no longer be challenged.  In *Renfroe*, the plaintiff sued her creditors' attorney for preparing and filing a writ of garnishment.  In *Lewis*, the attorney defendants at most failed to comply with discovery rules.  Rather than preparing filings or pleadings or taking some similar action in the underlying case, the Royston Rayzor defendants allegedly provided false information to a government attorney so that he would file criminal charges against Plaintiff.

Furthermore, the primary allegation lodged against the Royston Rayzor defendants involves an inspection and written report that, although performed by an attorney, could have been conducted by someone not possessing legal skills.  There is certainly an argument to be made that, based upon this Court's record, the conduct of the Royston Rayzor defendants did not require the education and skills of a lawyer.  Indeed, contrary to the defendants' contention that attorney immunity is absolute, another line of Texas cases indicates that lawyers can be held liable for actions taken in furtherance of a client's interests if those actions "are entirely foreign to the duties of an attorney."  *Poole v. The H. & T. C. R'Y Co.*, 58 Tex. 134, 137 (1882) (holding that a lawyer cannot shield himself from liability on the ground that he was an agent because no

-28-

one is justified on that ground in knowingly committing a willful and premeditated fraud for another); *see also Bourland v. State of Texas*, 528 S.W.2d 350, 353–54 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.)(upholding jury verdict finding attorney liable for drawing up papers for fraudulent business scheme).

This second line of cases is exemplified by *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no pet.), which was issued by the First Court of Appeals prior to its opinion in *Bradt*. The principle issue in *Likover* was whether an attorney acting for a client in settlement negotiations could be held liable for damages as a co-conspirator in a fraud action. In upholding a jury verdict finding the attorney defendant liable for conspiring with his client to force a third party to pay money under duress, the appellate court noted that even though an attorney has no general duty to an opposing party, an attorney can be held liable for "a fraudulent act that injures a third person" or for entering "into a conspiracy to defraud a third person." *Id.* at 472.

In a more recent case, the Thirteenth Court of Appeals followed *Likover* in reversing a summary judgment in favor of the attorney defendants because existing attorney immunity case law did not dispose of the causes of action lodged against them as a matter of law. *Mendoza v. Fleming*, 41 S.W.3d 781, 788 (Tex. App.—Corpus Christi 2001, no pet.). In *Mendoza*, the plaintiff alleged causes of action for wrongful garnishment, conversion, civil conspiracy, intentional infliction of emotional distress, and abuse of process claiming that the attorney defendants filed a garnishment procedure not merely to collect the debt the defendant owed their

client, but to wrongfully interfere with the defendant's judicial campaign.[36] In reversing the summary judgment, the appellate court noted that "[i]t has long been held that where a lawyer acting for his client participates in wrongful activities, his action in doing so is 'foreign to the duties of an attorney.'" *Id.* at 787 (quoting *Poole*, 58 Tex. at 137). After accepting all evidence favorable to the plaintiff as true, and resolving any doubt in plaintiff's favor, the appellate court determined that the attorney defendants failed to establish the defense of attorney immunity as a matter of law. *Id.* at 788.

Although *Likover* and *Mendoza* both involved non-courtroom settings, Texas courts have also refused to apply the attorney immunity doctrine in situations where lawyers were acting within the context of pending litigation. Indeed, in *Querner v. Rindfuss*, 966 S.W.2d 661 (Tex. App.—San Antonio 1998, pet. denied), the Fourth Court of Appeals specifically rejected the argument that "public policy requires an absolute privilege for every act or communication of an attorney simply because it is part of the litigation process."[37] *Id.* at 663. The underlying facts in *Querner* involved a suit brought by the beneficiaries of an estate against the estate's attorney for alleged bad acts that occurred during the probate of the estate. With an eye towards *Likover*, the appellate court reversed a summary judgment in favor of the attorney defendant because a question of fact remained. "Fraud vitiates all privileges. An attorney can be held liable for

---

[36] The garnishment occurred on the plaintiff's campaign accounts ten days before the primary election in which plaintiff was a candidate for the 138th Judicial District Court in Cameron County, Texas.

[37] It should be noted that the court in *Lewis* distinguished *Querner* from *Bradt* and *Renfroe* by emphasizing that the attorney in *Querner* owed duties to the beneficiaries of the estate. *Lewis*, 4 F. Supp. 2d at 679. Thus, the *Lewis* court asserted that the issue in *Querner* was not "whether an attorney could be liable to opposing parties, to whom he owed no duties, for actions taken in the course of discharging duties owed only to his client in litigation." *Id.* Rather, *Querner* involved a situation more akin to an attorney being sued by his own client.

engaging in fraudulent acts, if proven, even if those actions are undertaken in the context of litigation." *Id.* at 670.

Even the Supreme Court of Texas has tacitly rejected the argument that an absolute privilege applies to attorneys for conduct taken within a litigation context. In *McCamish, Martin Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999), the court reversed a summary judgment in favor of the attorney defendants holding that an attorney can be sued by a non-client for negligent misrepresentation under the RESTATEMENT (SECOND) OF TORTS § 552, despite the absence of privity or an attorney-client relationship. *Id.* at 795. It should be noted that *McCamish* differs from the case at hand and the cases discussed above because the attorneys in *McCamish* were sued for giving bad advice to the opposing parties during settlement negotiations rather than for committing a hostile act within an adversarial setting. Nonetheless, *McCamish* represents the Supreme Court of Texas' recognition that Texas law allows for attorneys to be held liable for causes of action other than legal malpractice claims brought by their own clients.

Federal courts have likewise held that the attorney immunity doctrine does not preclude all causes of action against attorneys. For example, in *Miller v. Stonehenge/Fasa-Texas, JDC, L.P.*, 993 F. Supp. 461 (N.D. Tex. 1998), the plaintiff sued the attorney defendant for her participation in serving a writ of execution on the plaintiff's property, a procedure which is normally conducted by a United States Marshal. During the execution, the attorney defendant demanded access to Plaintiff's home and, under threat of force, inspected, inventoried, and videotaped Plaintiff's "personal and intimate" property and effects. She also accosted the plaintiff as she was trying to leave demanding to know where she was going and telling her that

she could not leave. Even though the attorney defendant was authorized to participate in the execution of the writ by court order, the district court noted that her "skills as an attorney had no role in the events that transpired." *Id.* at 465. The court denied the attorney defendant's motion to dismiss because even if an attorney is acting for her client, she can be held liable for conduct that does not require "the office, professional training, skill, and authority of an attorney."[38] *Id.* at 465 (quoting *Taco Bell Corp.*, 939 F. Supp. at 532). One could contend that this case is analogous to the claims lodged against the Royston Rayzor defendants because the inspection conducted by Hunter and Gonzalez and the subsequent report, like the service of the writ, were duties that arguably did not require the skills and training of an attorney.

In a case that is similar to the case at hand, a federal district court in this district, despite expressing skepticism as to whether the plaintiffs' causes of action against an attorney defendant would ultimately succeed, nonetheless granted a motion to remand because "[t]enuous though it may be...the claim against [the attorney defendant] has the 'modicum of sturdiness' sufficient to

---

[38]     In *Miller*, the district court attempted to distinguish between *Bradt* (and its progeny) and *Likover* (and its progeny) by noting that the *Bradt* cases "involve actions taken in the context of litigation" while the *Likover* cases "involve lawyers assisting their clients in perpetuating fraudulent business schemes." *Miller*, 993 F.Supp. at 465. This Court does not necessarily think that this attempted distinction is accurate in all circumstances for at least two reasons. If the distinction made by the *Miller* court was controlling, an attorney acting for a client in a non-litigation capacity could not avail herself of the attorney immunity doctrine and would always be subject to suit, while trial counsel would always enjoy immunity. Texas law has never drawn such a distinction. Attorneys, both litigators and business attorneys alike, certainly act for their clients in circumstances outside of litigation. The presence of litigation makes it easier for a court to find that a lawyer is acting in an attorney-like capacity. Thus, it should come as no surprise that Texas case law supports the *Miller* court's conclusion. Second, the *Likover*-type cases do not necessarily require fraud for an attorney to lose immunity.

This Court notes that the case at hand does not fit squarely within the *Miller* distinction. Although Plaintiff, while technically not pleading a fraud cause of action, alleges that the defendants "committed" a fraud upon the ADA in order to procure the indictment against Bagga. Such alleged fraud was not for monetary profit as in *Likover*. Furthermore, although the Royston Rayzor defendants' actions were arguably taken in connection with litigation, based on the record before it, this Court cannot conclude that the complained-of conduct was taken in furtherance of that litigation.

withstand a claim of fraudulent joinder." *Transtexas Gas Corp. v. Stanley*, 881 F. Supp. 268,

271–72 (S.D. Tex. 1994). The plaintiffs in *Stanley* alleged civil conspiracy against the

defendants, one of whom was an attorney, for threatening to continue a campaign of defamation

and other acts aimed at destroying the plaintiffs' ability to do business. The attorney in that case

raised many of the same arguments made by the defendants in the instant case. The district court

reasoned remand was proper because "Texas law will hold an attorney liable for conspiring with

his client to unlawfully coerce money from a third-party by threatening to make defamatory

statements about the third-party." *Id.* at 271.

The result of this review of Texas law leaves two distinct lines of cases. On the one hand,

there is a line of cases holding that an attorney cannot be held liable for conduct relating to

ongoing litigation. On the other hand, there is a contradictory line of cases holding that an

attorney can be held liable for conduct associated with litigation if it is wrongful and outside the

classic tasks that call for an attorney's skills, education, judgment, and zealous representation.

When reviewing the question of improper joinder, a federal court must view the allegations in

the manner most favorable to the plaintiff, even when it doubts the merits of his or her claim. It

must also view any ambiguities in controlling law in the light most favorable to the plaintiff

despite the fact that the defendants might ultimately prevail as a matter of law in a later motion

for summary judgment.[39] This Court concludes, based on the record before it, that the attorney

immunity doctrine does not dispose of Bagga's claims as a matter of law.

---

[39]     One should remember that this Court does not have any evidence (affidavits or
otherwise) from either side upon which to base this ruling. Neither Hunter nor Gonzalez filed affidavits
or any other proof supporting their claims. Consequently, this Court's ruling should not be taken as a
ruling on the merits or even so much as a ruling that the claim should or should not survive a properly-
prepared summary judgment motion.

## 2.     Communication Privilege

In addition to the attorney immunity doctrine, the resident defendants joined with the other defendants in this case in arguing that the privilege protecting communications made in contemplation of or during court proceedings precludes Bagga's claims.  In general, communications made by a litigant, his attorney, or witnesses during court proceedings are absolutely privileged.[40] *Stanley*, 881 F. Supp. at 272; *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994) (privilege protecting communications made during the course of judicial proceedings extends to pre-trial proceedings, including affidavits filed with the court); *Laub v. Pesikoff*, 979 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (stating that "[a]ny communication, even perjured testimony, made in the course of a judicial proceeding, cannot serve as the basis for a suit in tort").

The Royston Rayzor defendants claim that any statements they made or information they provided to the Cameron County authorities were connected to either pending judicial proceedings or in contemplation of the prosecution of Plaintiff for a violation of Texas Penal Code § 32.33.  They point to *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App.—San Antonio 1997, no writ), which held that an absolute privilege applies to communications that bear some relationship to a pending or proposed judicial proceeding in which an attorney is employed as long as the communication is in furtherance of that representation.  Whether an alleged defamatory communication is related to a proposed or existing judicial proceeding is a question

---

[40]     Defendants claim that the immunity protecting court communications is applicable in any civil action, not just causes of action for defamation, slander, and libel.  They cite *McIntyre v. Wilson*, 50 S.W.3d 674, 682–83 (Tex. App.—Dallas 2001, pet. denied), for this proposition, which extended the privilege in a cause of action against attorney expert witnesses who were being sued for ethical violations.

of law. *Thomas*, 940 S.W.2d at 343. "All doubt should be resolved in favor of the communication's relation to the proceeding." *Watson v. Kaminski*, 51 S.W.3d 825, 827 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Randolph v. Jackson Walker, L.L.P.*, 29 S.W.3d 271, 278 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

It should be noted, however, that an absolute privilege does not extend to an attorney's communications made to third parties outside of judicial proceedings. *Watson*, 51 S.W.3d at 827. Indeed, in the cases cited by Defendants, the communications that were later ruled to be privileged involved situations where attorneys were clearly trying to secure the rights of their clients before instituting judicial proceedings. For instance, in *Thomas*, the attorney defendant who represented an executor of an estate that owned a one-half interest in property sent a letter to the owner of a one-fourth interest in the same property demanding that he cease and desist from trespassing on the land and from preventing sharecropping activities. In *Watson*, a prisoner sued an attorney for making statements to prison officials after the attorney was informed that the prisoner had written a letter attempting to extort money from his client. Both situations clearly involved steps taken by attorneys prior to the institution of litigation in an attempt to protect their clients' interests. In the case at hand, however, multiple lawsuits were already pending in a different state along with the prior enforcement actions here in the Southern District of Texas. Moreover, the defendants have not shown how any communications made by the Royston Rayzor defendants to the Cameron County authorities were in furtherance of any of those actions. "[I]n order for absolute privilege to apply, the communication must bear some relationship to a pending or proposed judicial proceeding in which an attorney is employed, *and* must be in furtherance of that representation." *Thomas*, 940 S.W.2d at 343 (emphasis added). Indeed, any

-35-

communications made by the resident defendants were directed at procuring the prosecution of Bagga, a proceeding in which they would not and could not have participated as legal counsel charged with protecting their clients' interests as any prosecution would have been pursued by the District Attorney's office.

The argument that their communications to the Cameron County authorities were in contemplation of judicial proceedings because a criminal prosecution would likely ensue also falls flat.[41] "[A]n investigation into criminal activity does not amount to a 'proposed judicial proceeding.' A judicial proceeding would only be 'proposed' when the investigating body found enough information either to present that information to a grand jury or to file a misdemeanor complaint." *SACU*, 115 S.W.3d at 99. Therefore, the communication privilege is not necessarily applicable to the resident defendants in this case.

The communication of an alleged wrongful act made to an official authorized to protect the public from such an act is entitled only to a qualified privilege. *See Thomas*, 940 S.W.2d at 343. A criminal complaint to a district attorney has been held not to amount to a judicial or proposed judicial proceeding. Therefore, such a complaint is not absolutely privileged. *SACU*, 115 S.W.3d at 99. To be entitled to qualified immunity, a defendant's statement must (1) be without malice, (2) concern a subject matter that is of sufficient interest to the author, and (3) be communicated to another party having a corresponding intent or duty. *Id.* Clearly, in this case, elements two and three are present. Nevertheless, the failure to communicate all of the known information and/or the communication of false information (as is alleged by Bagga) could raise a

---

[41]    The logical extension of this argument would require a result that no one could ever succeed in a malicious prosecution lawsuit involving an underlying criminal proceeding because such prosecutions are almost always initiated by some communication to the authorities.

fact issue regarding the presence of malice. Malicious conduct would destroy any such qualified privilege.

After reviewing all of the uncertainties in the controlling case law and interpreting them in favor of Plaintiff, this Court, while skeptical about the actual ability of Bagga to prevail on his claims, finds that neither the attorney immunity doctrine nor the privilege protecting communications made in relation to court proceedings absolutely preclude Bagga's causes of action against the resident attorney defendants. Therefore, the Court must next determine whether Bagga can possibly succeed under any cause of action against the Royston Rayzor defendants. Despite the fact that Plaintiff has alleged four (possibly five) causes of action against the defendants, the Court will only discuss the malicious prosecution claim since Plaintiff need only show a possibility of success on any one of his claims in order to defeat this Court's subject matter jurisdiction. *See Green v. Amerada Hess Corp.*, 707 F.2d 201, 208 (5th Cir. 1983).

### 3.    Malicious Prosecution

In order to succeed on a malicious prosecution claim under Texas law, Plaintiff must prove: (1) the commencement of a criminal prosecution; (2) with malice; (3) without probable cause; (4) resulting in an acquittal; and (5) damages. *Digby v. Texas Bank*, 943 S.W.2d 914, 918–19 (Tex. App.—El Paso 1997, writ denied). All of the defendants, most notably the Royston Rayzor defendants, argue that Bagga cannot possibly succeed on his malicious prosecution claim because he cannot prove lack of probable cause.[42] Probable cause is defined as "the existence of such facts and circumstances as would excite belief in the mind of a reasonable

---

[42]    The defendants, while denying the merits, do not question the other elements of Bagga's malicious prosecution claim.

person, that the person charged was guilty of the crime for which he was prosecuted." *Id.* at 921.

Defendants specifically cite *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466 (Tex. 2004), in arguing that Plaintiff cannot prove that the defendants lacked probable cause when they "lodged" the criminal charges against Bagga.[43]  In *Martin*, a debtor owed a bank $50,000, which was secured by livestock on a ranch.  The debtor admitted that he had sold a substantial part of the collateral and kept the money for himself.  The bank reported this to the authorities, who subsequently indicted the debtor for violating the same statute at issue in the instant matter.  As in the case at hand, the charges were later dismissed.  The Supreme Court of Texas found that there was probable cause to initiate or procure this prosecution as a matter of law because the debtor admitted the objective, statutory elements of the crime at trial.  *Id.* at 470. The court explained that the admissions at trial established all of the objective elements of the crime and, therefore, Martin could not establish the absence of probable cause in his subsequent lawsuit.  The court also ruled that while a complainant's failure to provide a full and fair disclosure is relevant to malice and causation, such a failure "has no bearing on probable cause." *Id.* (quoting *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 519 (Tex. 1997)).  "Once a citizen has probable cause to report a crime, there can be no malicious prosecution, even if the subsequent report fails to fully disclose all relevant facts." *Id.*.

Defendants claim that Bagga, like the debtor in *Martin*, has admitted to the objective

---

[43]        Although it was ultimately the ADA's choice to bring criminal charges against Bagga, the defendant's pleadings contain the admission that they "lodged" criminal charges against Plaintiff. *See Docket No. 49*, at 8.

elements of a § 32.33 violation.[44]  Citing to Bagga's Original Petition and to the Schwartz affidavit, they claim that he admitted that he was a debtor who defaulted on a secured loan; that he signed a security agreement that created a security interest in the equipment; that FL Receivables was a secured party who had demanded return of the secured property; and that Bagga removed the equipment without the consent of FL Receivables.  Plaintiff adamantly contests these assertions arguing that he did not individually default on any of the loans, which were made to business entities rather than to him personally.  He also argues that even though he signed the security agreements, he signed only as an officer on behalf of the real estate and operating entities.  Furthermore, he points out that Captec never demanded the return of the equipment and that Schwartz admitted in a deposition that Bagga returned some of the

---

[44]     There are two ways of violating Texas Penal Code § 32.33. While it is unclear which portion of § 32.33 Bagga was indicted for violating, the most logical subsection is § 32.33(b), which states as follows:

> A person who has signed a security agreement creating a security interest in property or a mortgage or deed of trust creating a lien on property commits an offense if, with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of the property.

§ 32.33(e) states as follows:

> A person who is a debtor under a security agreement, and who does not have a right to sell or dispose of the secured property or is required to account to the secured party for the proceeds of a permitted sale or disposition, commits an offense if the person sells or otherwise disposes of the secured property, or does not account to the secured party for the proceeds of a sale or other disposition as required, with intent to appropriate (as defined in Chapter 31) the proceeds or value of the secured property.  A person is presumed to have intended to appropriate proceeds if the person does not deliver the proceeds to the secured party or account to the secured party for the proceeds before the 11th day after the day that the secured party makes a lawful demand for the proceeds or account.

-39-

equipment, information that was not provided to the Cameron County authorities.[45]  Finally, he

argues that he had the tacit approval and effective consent of Captec to move the equipment.  In

essence, Bagga distinguishes his case from *Martin* asserting that he never admitted to the

objective elements of the crime for which he was indicted.

The two main pieces of evidence that were allegedly provided to the Cameron County

authorities included the Schwartz affidavit and the report of inspection written by Hunter.  The

Schwartz affidavit was executed in April 2003 and states: "Demand was made to [Bagga] to

deliver possession of the secured property and equipment to us, but to date he has not done so."

It also states that Bagga refused to disclose the location of the equipment and that he never had

the consent of Captec to move the collateral.  On September 12, 2003, prior to the January 2004

indictment, Schwartz's deposition was taken in relation to one of the Pennsylvania actions.  *See*

Pl's Orig. Pet., Ex. 4, vol. 1.  Schwartz admitted in the deposition that some of the equipment

had been returned to the Texas locations.[46]  Under Texas law, a court "must evaluate the

---

[45]       Citing *Digby*, Plaintiff goes on to argue that probable cause did not exist because the
defendants failed to provide a full and fair disclosure to the Cameron County authorities.  *Digby* involved
a malicious prosecution claim made by a borrower against a bank and its officers and directors.  The
appellate court reversed a summary judgment because fact issues existed regarding the probable cause
and malice elements of malicious prosecution.  The *Digby* court held:

> [I]f the party causing the complaint to be filed does not act in good faith in disclosing to
> the prosecuting attorney all material facts known to the party, probable cause does not
> exist.  *A plaintiff therefore attacks both the presumption of good faith and the existence
> of probable cause by producing evidence suggesting that the informant withheld relevant
> exculpatory facts when reporting to law enforcement authorities.*

*Digby*, 943 S.W.2d at 922 (emphasis added).  As noted by the Supreme Court of Texas in *Martin*,
however, failure to provide a full and fair disclosure has no bearing on probable cause.  *Martin*, 144
S.W.3d at 470.

[46]       It should be noted, however, that Defendants point out in their motion to transfer venue
[Docket No. 49] that part of their RICO claim in Pennsylvania involves allegations that Plaintiff returned